UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

     v.                                             **OPINION AND ORDER**

NICKY VICTOR,                                  22-CR-00596 (PMH)

                    Defendant.
-----------------------------------------------------------X

PHILIP M. HALPERN, United States District Judge:

Nicky Victor ("Defendant") stands charged in a two-count indictment with being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). (Doc. 8). Before the Court is Defendant's motion to suppress evidence, pursuant to Federal Rules of Criminal Procedure 12(b)(3)(C) and 41(h), recovered from a search of a vehicle Defendant was operating. (Doc. 18). Defendant filed his motion papers on March 31, 2023 (Doc. 18; Doc. 19, "Def. Br."), the Government filed its opposition on April 28, 2023 (Doc. 24, "Govt. Br."), and the motion was fully briefed with the filing of Defendant's reply on May 12, 2023 (Doc. 25, "Reply"). Defendant's motion to suppress evidence "relates to the September 9, 2022 incident at issue in Count Two of the Indictment." (Def. Br. at 1).

The Court held a status conference on July 19, 2023 and heard argument from the parties on the motion. (*See* July 19, 2023 Min. Entry). The Court determined that the parties' submissions were sufficiently detailed so as to demonstrate the absence of contested issues of material fact.[1]

---

[1] "A defendant moving for the suppression of evidence seized following a search is not automatically entitled to an evidentiary hearing." *United States v. Garcia*, No. 18-CR-00178, 2018 WL 3407707, at *2 (S.D.N.Y. June 5, 2018) (quoting *United States v. Barrios*, 210 F.3d 355, at * 1 (2d Cir. 2000)). An evidentiary hearing on a suppression motion is appropriate where a defendant "supports his motion with moving papers that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *Barrios*, 210 F.3d at *1. "In other words, a defendant is entitled to an evidentiary hearing where there is a contested

Based upon the parties' submissions, the oral argument heard from the parties, and for the reasons set forth below, Defendant's motion is DENIED.

## BACKGROUND

At approximately 1:10 a.m. on September 9, 2022, Peekskill Police Department ("PPD") Officer Paul Moerlins ("Moerlins") was on patrol near the area of Main Street and Husted Avenue in Peekskill, New York. (Def. Br., Ex. B). Officer Moerlins observed a red Ford Mustang, driven by Defendant, traveling 48 miles per-hour in a 30 mile-per-hour zone and initiated a traffic stop. (*Id.*). Officer Moerlins approached the Ford Mustang and stated, "How are you doing, sir? Peekskill Police. Can I get your driver's license and registration please?" (*Id.*, Ex. C at 01:10:15). Defendant replied, "Get the fuck out of my face. Give me my ticket. Whatever you're doing, go ahead and give me my ticket," and handed Officer Moerlins his driver's license and registration for the Ford Mustang he was driving (*Id.* at 01:10:19). Officer Moerlins learned, in reviewing the registration of the Ford Mustang, that the vehicle was registered to Tiffany Thompson, Defendant's wife. (*Id.*). Officer Ronald Stroh ("Stroh") joined Officer Moerlins as he was verifying Defendant's documents. (*Id.*). Officer Moerlins issued Defendant tickets for speeding, operating an uninspected motor vehicle, and for a license plate cover violation. (*Id.*). Defendant grabbed the tickets, looked at Officer Moerlins and said "pussy," then drove away at a high rate of speed without headlights turned on and without signaling. (Def. Br., Ex. B at USAO_000360). Officers Moerlins and Stroh pursued Defendant in their patrol vehicles, with

---

issue of material fact." *United States v. Zimmerman*, 480 F. Supp. 3d 446, 451 (E.D.N.Y. 2020). Defendant argues that the Court should hold an evidentiary hearing "to resolve the factual disputes raised in the motion." (Def. Br. at 16). The court in *Zimmerman* denied a request for an evidentiary hearing where "the initial encounter between the officers and Zimmerman . . . as well as the preliminary search of the vehicle at the scene, were recorded on two separate body cameras worn by the officers. So, too, the inventory search of the vehicle was recorded," and the court therefore concluded that "the material facts relevant to Zimmerman's motion are uncontroverted." 480 F.Supp.3d at 452. The initial traffic stop and the subsequent search of Defendant's vehicle were recorded by body cameras worn by four seaparte officers. (Def. Br., Exs. C-F). Here too, as in *Zimmerman*, the Court concludes that the material facts relevant to Defendant's motion are controverted and as such, an evidentiary hearing is unnecessary.

their emergency lights on, following him to the parking lot of the Turnkeys Apartments where he had parked his vehicle. (*Id.*).

The parking lot for the Turnkeys Apartments is reserved for tenants with parking permits and signage posted in the lot states that "unauthorized vehicles will be towed at the owner's expense." (*Id.*, Ex. G). Officer Moerlins reached the parking lot first, and found Defendant walking away from his vehicle. (*Id.*, Ex. B). Officer Moerlins ordered Defendant to return to his vehicle. Defendant refused to return to his vehicle, replying "I don't got to do shit," began walking towards Officer Moerlin and assumed what Officer Moerlins refers to as a "fighting stance," with his fists clenched in front of his face. (*Id.*, Ex. C at 01:23:13). Officer Moerlins then "immediately grabbed Victor and threw him into the vehicle" and the two then engaged in a physical altercation until Officer Stroh arrived on the scene and tased Defendant twice. (*Id.* at USAO_000360). Officers Moerlins and Stroh attempted to restrain Defendant and repeatedly ordered him to put his hands behind his back so that he could be handcuffed, Defendant refused this instruction and continued fighting and biting the officers. (*Id.*, Ex. C at 01:23:39). Defendant was eventually handcuffed and placed under arrest. (*Id.*, Ex. B. at USAO_000361).

While Defendant was being placed under arrest, his friend, Deandrea Braxton ("Braxton") arrived at the parking lot. (*Id.*). Defendant asked Braxton to pick up his car keys but Officer Stroh told Braxton to "leave the keys" because the Ford Mustang was "getting impounded." (*Id.*, Ex. C at 01:27:14). Defendant then asked Officer Stroh why his vehicle was being impounded and Officer Stroh responded, "you should have just taken your tickets and been a cooperative gentleman." (*Id.*, Ex. D at 01:27:27). Defendant was then placed into a patrol vehicle (*Id.*). Braxton was distressed and concerned that Officers Moerlins and Stroh were too aggressive with Defendant. Officer Nolte, who had arrived at the parking lot after Defendant had

been restrained, responded that "I don't know what happened to lead up to this but where we're at now, this is going one way. He's going back tonight, the car is going, there's nothing you can do by hanging out here to change this. I'm sure he'll be released at some point later tonight, but for now this is it." (*Id.*, Ex. E at 01:29:01).

PPD Officers Justin Larchevesque ("Larchevesque"), Michael Nolte ("Nolte"), Henderson, and Sergeant Colucci arrived at the scene at this point to assist Officers Moerlins and Stroh. The officers began looking for the keys to the Ford Mustang so that they could conduct an inventory search. (*Id.*, Ex. B at USAO_000361). During the search for the car keys, Braxton remained standing near the car. Officer Stroh asked, pointing at an object protruding from Braxton's waist, "Is that the key right there?" to which Braxton responded by lifting up her shirt and stating, "No, sir. That's my phone." (*Id.*, Ex. E at 01:35:37). The officers, after spending several minutes canvassing the area where the vehicle was parked, were unsuccessful in locating the car keys. (*Id.*, Ex. B at USAO_000361). Officer Nolte then stated, "I'm going to use the slim jim to pop his car, we got to inventory this thing, he's probably got a gun in there if he's acting a fool." (*Id.*, Ex. E at 01:31:30). Officers Nolte and Stroh then used a lockout kit to gain access to Defendant's vehicle. (*Id.*, Ex. D at 01:36:30; *id.*, Ex. E at 01:35:50). The officers thereafter began to conduct an inventory search of the vehicle and Officer Henderson located a Glock 23 handgun loaded with ten .40 caliber rounds under the front passenger's seat. (*Id.*, Ex. B at USAO_000361). After the officers located the firearm and ammunition, Braxton began to walk away from the vehicle and Officer Moerlins found the car keys in the spot where she had been standing. (*Id.*, Ex. F at 01:38:36). Officer Larchevesque recovered the keys and ordered Braxton to leave the parking lot, telling her, "you're going to get arrested for obstruction so I suggest you get out of here, now." (*Id.*, Ex. F at 01:3:47). At this point, Braxton left the parking lot.

Most of the responding officers then accompanied the defendant to PPD headquarters, while Sergeant Colucci, Officer Nolte, and Officer Larchevesque stayed behind to finish the inventory search and impoundment. (*Id.*, Ex. B at USAO_000361-62). The officers who stayed behind stood by the vehicle for several minutes without conducting any further search, awaiting guidance from PPD detectives on how to secure and preserve the firearm and ammunition discovered. (*Id.*, Ex. E at 01:39:30, 01:47:54). Approximately ten minutes after Defendant and most of the other officers had left the parking lot, Sergeant Colucci had a phone call with a PPD lieutenant, Lieutenant Bielomyza, who wanted the officers to tow the Ford Mustang to the police impound lot and complete their inventory search at that location. (*Id.*, Ex. E at 01:47:20-01:48:49). Sergeant Colucci stated to Officers Nolte and Larchevesque that he "didn't agree" with Lieutenant Bielomyza's proposed plan of action and then each of the three disabled the audio capability of their body-worn cameras for approximately one minute. (*Id.*, Ex. E. at 01:49:02-01:50:09; *id.*, Ex. F at 01:49:04-01:50:00). Both officers then turned their cameras' audio capabilities back on, photographed the firearm, and completed the inventory search of the vehicle at the parking lot. (*Id.*, Ex. B at USAO_000361-62). A towing company later towed the Ford Mustang to PPD headquarters. (Gov. Br., Ex. 7, at USAO_000406).

## ANALYSIS

I. <u>Reasonable Expectation of Privacy</u>

The Government argues that Defendant lacks standing to challenge the impoundment and inventory search of the Ford Mustang because he "has not offered sufficient proof that the owner authorized him to operate the Ford Mustang on September 9, 2022." (Govt. Br. at 11). "To mount a challenge to search of a vehicle, defendants must show, among other things, a legitimate basis for being in it, such as permission from the owner." *United States v. Ponce*, 947 F.2d 646,

649 (2d Cir. 1991); *see also United States v. Triana-Mateus*, No. 98-CR-00958, 2002 WL 562649, at *3 (S.D.N.Y. Apr. 15, 2002) ("In situations involving a search of a vehicle, where the defendant can demonstrate that he had the keys to the car and permission from the owner to drive it, he has standing to challenge the search of the car."). Here, Defendant has submitted an affirmation from the registered owner of the vehicle, Tiffany Thompson, stating that Defendant "generally has permission to use [her] vehicle, and he had permission to use the vehicle on or about September 9, 2022, when he was arrested." (Doc. 25-1). Defendant was "the sole occupant of the car at the time of his arrest and had exclusive use of it." *See United States v. Zimmerman*, 480 F. Supp. 3d 446, 452 (E.D.N.Y. 2020).

Accordingly, the Court finds that Defendant "has a sufficient expectation of privacy to seek suppression" of the evidence found in the vehicle. *Id.*

II.  Impoundment of the Ford Mustang

Defendant argues that the Peekskill Police Department's "decision to impound the Ford Mustang after [Defendant's] arrest was not reasonable under the Fourth Amendment." (Def. Br. at 11). "It is well established that police have the authority, despite the absence of a warrant, to seize and remove from the streets automobiles in the interests of public safety and as part of their community caretaking functions—an authority that is beyond reasonable challenge." *United States v. Lyle*, 919 F.3d 716, 728 (2d Cir. 2019). The Second Circuit, in *Lyle*, looked to the totality of the circumstances and found impoundment reasonable where: (i) the defendant was the sole occupant of the vehicle, (ii) there was no third party immediately available to entrust with the vehicle's safekeeping, (iii) the officers could not ascertain how long the car would be unattended in light of the defendant's arrest, and (iv) even if released, the defendant did not possess a valid license to drive it. *Id.* The Second Circuit went on to hold in *Lyle* that "[w]hile

6

the existence of and an officer's adherence to a standardized criteria may be helpful in evaluating the reasonableness of an impoundment, we decline to adopt a standardized impoundment procedure requirement." *Id.* at 731. "Some degree of standardized criteria or established routine," is nevertheless required "to ensure that impoundments and inventory searches are not merely a ruse for general rummaging in order to discover incriminating evidence." *Id.* at 728.

Employing a totality of the circumstances analysis, as is required, the Court concludes that the impoundment here was reasonable under the Fourth Amendment. Defendant was the sole occupant of the Ford Mustang at the time of his arrest and although a third party–Braxton–was present, it was not clear that she had authorization to drive the vehicle from its registered owner. *United States v. Bethea*, 191 F. Supp. 3d 249, 256 (E.D.N.Y. 2016) ("even if the Court accepted Defendant's bald assertion that the relative gave him permission to use the Vehicle, the Court does not know whether the relative had authorization from the owner to lend the Vehicle to other drivers").Equally, it is not clear Braxton had a valid driver's license. Braxton, furthermore, could not have been entrusted with the vehicle's safekeeping because the vehicle's keys could not be located by the officers despite a search of the parking lot and Braxton herself repeatedly denied that she had possession of the keys.

Defendant argues that Officer Nolte's comment to Braxton that Defendant would be "released at some point later tonight" is evidence that "the PPD Officers on the scene had no basis to believe" that the vehicle would be left unattended "for a prolonged period of time." (Def. Br. at 11-12). The conclusion is flawed. Officer Nolte did not arrive at the parking lot until after Defendant was restrained, and so he did not observe Defendant engaging in a physical altercation with Officer Moerlins or him biting Officers Moerlins and Stroh. Indeed, while speaking with Braxton, Officer Nolte acknowledged this fact and prefaced his comment by noting that "I don't

7

know what happened to lead up to this but where we're at now, this is going one way." (*Id.*, Ex. E at 01:29:01). There is no evidence that the PPD officers on the scene could have ascertained how long the car would be unattended in light of Defendant's arrest.

Defendant's vehicle was unlawfully parked on a lot that only allowed permit parking and was reserved for residents of the Turnkeys Apartments at approximately 1:30 a.m. By impounding the vehicle, the PPD officers ensured that it was not left in the private lot "where it could have become a nuisance or been stolen or damaged" the next day. *Lyle*, 919 F.3d at 731. Defendant argues that the PPD officers impounded the vehicle "solely for the purpose of investigation" rather than to serve a community caretaking function. (Def. Br. at 13 (quoting *Lyle*, 919 F.3d at 731)). Defendant points, in support of this contention, to Officer Nolte's comments voicing his suspicions that Defendant "probably [had] a gun in [the vehicle] if he's acting a fool." (Def. Br., Ex. E at 01:31:30). As the Second Circuit recognized in *United States v. Lopez*, "[w]hen officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes." 547 F.3d 364, 372 (2d Cir. 2008). The PPD's impoundment of Defendant's vehicle in the instant case was carried out pursuant to the PPD's standardized procedures and for legitimate custodial purposes. As such, "even if the record did clearly reflect that the officers were motivated, at least in part, by the expectation that evidence would be discovered in the car, [Defendant']s Fourth Amendment argument would still be without merit." *United States v. Williams*, 930 F.3d 44, 56 (2d Cir. 2019). There is no

indication, as in *Lyle*, that the officers acted in bad faith or "solely for the purpose of investigation in exercising their discretion to impound" the vehicle. 919 F.3d at 731.

Accordingly, the Court holds that the PPD's decision to impound Defendant's vehicle was reasonable under the Fourth Amendment.

III.   Inventory Search of the Ford Mustang

Defendant argues that the PPD's inventory search of Defendant's vehicle violated the Fourth Amendment because "PPD officers did not perform the inventory search of the Ford pursuant to standardized procedures." (Def. Br. at 16). When law enforcement officials take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without probable cause. *United States v. Williams*, 930 F.3d 44, 53 (2d Cir. 2019). A valid inventory search is not done "to detect crime or to serve criminal prosecutions," but "for quite different reasons: (1) to protect the owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger." *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008). "An inventory search pursuant to standardized procedures will be upheld unless there is a showing that the government acted in bad faith or searched the car for the sole purpose of investigation." *United States v. Arango-Corre*a, 851 F.2d 54, 59 (2d Cir. 1988).

The PPD standardized procedures permit officers to conduct an inventory search at "the location at which the vehicle is seized" and further permits officers to search "all areas of the vehicle in which personal property or hazardous materials may reasonably be found, including but not limited to the passenger compartment, trunk and glove compartment." (Gov. Br., Ex. 1 at USAO_000385). The PPD officers, in conducting the instant inventory search, examined "all areas of the vehicle in which personal property or hazardous materials may reasonably be

found," including the vicinity underneath the passenger's seat, and found the firearm and ammunition. (*Id.*). The PPD officers conducted the inventory search pursuant to standardized procedures and Defendant has not made a showing that the government acted in bad faith. As discussed *supra*, the search served a legitimate, community caretaking function and was not therefore conducted "for the sole purpose of investigation." *Arango-Corre*a, 851 F.2d at 59.

Accordingly, the Court holds that the inventory search of Defendant's vehicle did not violate the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence obtained as a result of the impoundment of the Ford Mustang and the resulting inventory search is DENIED.

As noted during the July 19, 2023 conference, time has been excluded under the Speedy Trial Act through the date of the next status conference in this case on October 17, 2023 at 12:00 p.m. in Courtroom 520. At the October 17, 2023 status conference, the Court will set a trial date and enter a Pretrial Scheduling Order.

**SO ORDERED.**

Dated: White Plains, New York
July 25, 2023

_____
Philip M. Halpern
United States District Judge